BROWN et al. v. REPUBLICAN MOUNTAIN SILVER MINES, Limited, et al.

#### (Circuit Court, D. Colorado. April 3, 1893.)

1. FOREIGN CORPORATION—REORGANIZATION—NOTICE.

A mining company was organized in England for the purpose of operating mines in the United States. Its principal office was in London, but all its property except office furnishings was in the United States, and consisted of mines and mining lands. All of its business was conducted in the United States, and four fifths of its stock was held there. A by-law of the company authorized a transfer of its property and business, or a reorganization, upon not less than one month's, and not more than three months', notice to the stockholders of the meeting to be held for that purpose. The English stockholders and officers, however, attempted to reorganize the company under a British statute providing for a preliminary meeting and a confirmatory meeting held on not less than fourteen days', nor more than one month's, notice; and a resolution to reorganize was in fact passed by the English stockholders at a meeting held pursuant to notices sent out fourteen days before, but which in fact were not received by the American stockholders until after the meeting. *Held,* that there was no conflict between the by-law and the English statute, and that the former should control; and therefore that the proceedings of the English stockholders were void for want of notice.

2. SAME—JURISDICTION OF AMERICAN COURTS.

In such case the American stockholders properly resorted to an American court for protection of their rights, and could not be required to seek their remedy in the English courts.

3. SAME—INTERNATIONAL COMITY.

The reorganization in question having been the voluntary act of the English stockholders, and not of the British courts, and having been in flagrant violation and disregard of the rights of the American stockholders, no principle of international comity required that it should be sustained.

In Equity. Bill by J. Warren Brown and another against the Republican Mountain Silver Mines, Limited, and other defendants. Heard on the merits, and decree entered for complainants.

R. S. Morrison and Willard Teller, for complainants.

Charles E. Gast, for defendants.

RINER, District Judge. This is a bill in equity by J. Warren Brown and Porter P. Wheaton, on behalf of themselves and all other stockholders, similarly situated, of the Republican Mountain Silver Mines, Limited, against that corporation and certain of its directors. The defendant company is a corporation organized under the laws of Great Britain, with its principal office in the city of London. The corporation was formed, as shown by its memorandum of association, for the purpose of purchasing or otherwise acquiring and working mines and mining rights in the state of Colorado, in the United States of America, or elsewhere, "and in particular the land, minerals, and mining rights situate on the Republican mountain, near Georgetown, Clear Creek county, in the state of Colorado, in the United States of America, with the ore houses and other buildings erected on the said land, and the plant, machinery, stock, implements, and effects used in or about or be-

o

longing to the said mine, mill, ore houses, and other buildings, together with the business of the mine and the good will thereof." It is admitted by the pleadings that all the property of the company, except its office furnishings in London, is situated in Clear Creek county, in the state of Colorado, the property being particularly described in the bill of complaint. It is alleged in the bill, and admitted by the answer, that the legal title to the mining property of the company in Colorado is held by one of the defendants, Horace H. Atkinson, as trustee, but that the defendant company is the equitable owner thereof, and that Atkinson has no interest in the property, but simply holds it as trustee for and on behalf of the defendant company. The proof shows that about four fifths of the capital stock of the company is held by the American stock-holders, who are represented by the complainants; the other fifth being held in England.

In 1888, because of certain differences and disagreements existing between the English and American stockholders, the details of which it is unnecessary to state, Mr. Brown, one of the complainants, went to London, representing a majority of four fifths of the capital stock, for the purpose of electing a board of directors favorable to carrying out the plan of operating these mines agreed upon by the American stockholders. The record shows that at the annual meeting of that year certain concessions were made to the American stockholders. An American subboard was appointed, which it was agreed should carry out the plans of mining proposed by the American stockholders, and, in view of the concessions so made by the company respecting the rights of the American stockholders, Mr. Brown did not carry out his original purpose of electing an entire new board. A loan was made for the purpose of carrying on the mining operations, and after they had progressed for a time the English board declined to carry out the plan of operation proposed, and the loan made for the purpose of carrying on the mining operations was reduced to a judgment against the company, which judgment was brought by one of the directors of the London board, and subsequently secured by trust deed in his favor. This action taken by the English board was an end to the active operation of the company in the development of the property. By the trust deed the control of the legal title to all of this property, through the trustee, was secured to the English stockholders, who sought to control the assets of the company by threats of foreclosure.

In 1891 the English stockholders attempted to wind up the affairs of the company by a voluntary proceeding under the English statute, and to effect a reorganization of the company. To carry out this purpose, on the 8th of June, 1891, the secretary of the company sent out notices from the London office calling a winding-up meeting of the stockholders for the 16th of June, 1891. These notices were sent to the American stockholders with full knowledge upon the part of the English directors and stockholders that it would be impossible for the American stockholders to be present at the meeting, either in person or by proxy, for the

reason that the time given was not sufficient for the notice to reach the American stockholders and to enable them to be represented. In fact, the record shows that this notice was not received in America until after the date fixed for the meeting. June 17, 1891, notice for a second or confirmatory meeting, to be held July 1st, was sent out to the stockholders. The notice was in the following words:

"The Republican Mountain Silver Mines, Limited.

"Registered Office, 2 Copthall Building,
"London, E. C., 17th June, 1891.

"Notice is hereby given that an extraordinary general meeting of the members of the above-named company will be held at Winchester House, Old Bond street, in the city of London, on Wednesday, the 1st day of July, 1891, at 12 o'clock noon precisely, when the subjoined resolutions, which were passed at the extraordinary general meeting of the company held on the 16th day of June, 1891, will be submitted for confirmation as special resolutions: '(1) That the company would be wound up voluntarily, and that Mr. Edward F. Tremayne, of 2 Copthall Building, London, E. C., be, and he is hereby, appointed liquidator. (2) That a general authority be, and the same is hereby, conferred on the liquidator of the company to transfer or sell the whole or any portion of the property or business of the company to another company, and to receive in compensation or part compensation for such transfer or sale shares in any such company, in whole or in part paid up, for the purpose of distribution amongst the members of the company.

"By order of the board.          E. F. Tremayne, Secretary."

This would give but 13 days exclusive of July 1st, or 14 days including July 1st, from the date of the notice until the date of the meeting, which the English stockholders knew was not sufficient time to enable the American stockholders to be represented at the meeting. The meeting was held, and a liquidator appointed, through whom a reorganization was proposed, and the following proposition was submitted to the American stockholders:

"The American shareholders have the option of paying out the English interest, and thus to take the whole property in their own hands, or coming in to subscribe to the capital of a new company according to a scheme to be put before the shareholders by the liquidator."

Thus we have one fifth of the shareholders proceeding to wind up the affairs of the company, through a liquidator selected by them, without sufficient notice to the parties holding the four fifths of the stock to enable them to be represented when this course was adopted, and without giving them an opportunity to have any voice whatever as to the manner in which the affairs of the company should be closed and its property disposed of. While it is true the corporation was organized under the laws of England, yet all of its property is situated in America, and its business is to be conducted in this country. Not only that, but four fifths of the shares of its capital stock are held in America; and the question now is, has this court jurisdiction to protect the owners of four fifths of the capital stock of the company, when the property of the company is all situated in this country, in their rights in respect thereto, or must they seek their remedy in the English courts? Article 136 of the by-laws of the company provides as follows:

"136. The company, by a resolution passed by three fourths of the votes at an extraordinary general meeting convened with notice of the object, and confirmed by a similar majority at a second extraordinary general meeting convened in a like manner, and held not less than one month, nor more than three months, thereafter, may amalgamate its business with, or transfer its property and business to, any other similar undertaking or company, or purchase or acquire the business or property of any company, partnership, or person carrying on a business similar to that of the company, upon such terms as may be agreed on in each case, and may pay for any business so acquired either in cash or in shares, to be treated either as wholly or in part paid up, or partly in cash and partly in shares, or in such other manner as may from time to time be deemed expedient to the company."

It is contended by counsel for defendant that this by-law has no application to the proceeding had by these English stockholders, and that the notice therein required was not necessary for the transaction of the business of these meetings of June 16th and July 1st, but, on the contrary, that the notice for these meetings was the notice required by section 51 of an act of the English parliament, (chapter 89,) being an act entitled "An act for the incorporation, regulation, and winding up of trading companies and other associations." This section of the English statute provides that for the second meeting notice shall be given not less than fourteen days nor more than one month from the date of the meeting at which the resolution was first passed. I think an examination of this by-law shows clearly that it was intended to cover meetings called for the very purpose of doing just what was done by these English stockholders at the meeting held July 1st. While it is true that there is a difference between the by-law and the statute as to the maximum time, yet the by-law does not conflict with the statute, as they both provided for one month's notice. My own view is that the by-law should be held to govern, for the reason that it amounts to an agreement between the stockholders that the action, such as was taken at the July meeting, should not be taken except upon at least a month's notice, thus giving all of the stockholders an opportunity to be represented at the meeting and have a voice in the business transacted.

I think an examination of this record discloses that it was the purpose of these English stockholders, in calling the meeting as they did, to deprive the American stockholders of their right to be heard as to the method of winding up the affairs of the company, for they well knew that, if the American stockholders had an opportunity to be represented at the meeting, the scheme for winding up the affairs of the company in the way in which it was attempted to be done would fail, and for that reason they purposely avoided giving the notice in sufficient time to enable the American stockholders to have representation at the meeting. Such a proceeding would not be tolerated by the courts of this country, even by a majority of the stockholders of a corporation organized under our laws, and certainly not by a minority holding but one fifth of the stock. Certainly, if there had been any disposition upon the part of these English stockholders to deal fairly with the American stockholders, they could at least have given one month's notice of the confirmatory meeting, which was authorized both by the statute and the by-law. This they did not do, and for the reason, as I think the

record discloses, that it was not their purpose to give the American stockholders any opportunity to be represented, and thereby enable the English stockholders to take an unconscionable advantage in adopting a plan for winding up the affairs of the company in a manner highly beneficial to the English interests. But it is urged that the action taken by them, which, as I have already stated, would not be tolerated in this country by a majority, should be sustained upon the ground of international comity, and because the laws of England provide that the stockholders not assenting to the proposition may appeal to the courts. Whatever might be the rule if this was an attempt upon the part of the English stockholders to wind up the affairs of the company by proceedings in court, as authorized by the English law, I do not think the action taken by the English board in this case should be sustained upon principles of international comity. This was an effort upon the part of these English stockholders to wind up the affairs of the company by their own voluntary act, without resorting to the courts of either England or this country; hence no court has given its sanction to the scheme in question. If such action had been taken by a corporation in any of our own states it would have been the duty of the courts of that state to treat it as an unlawful exercise of corporate power, and I do not think the courts of this country should tolerate or sustain an act taken by a minority of the stockholders of a company in a foreign country, which it would not sanction if the act had been done in this country, and which, if sustained, would seriously prejudice the rights of the citizens of this country in respect to property situated here. International comity can ask no such recognition. The action taken by these English stockholders was repugnant to the fundamental principles of the law of this country, and it should not be sanctioned or sustained. Neither am I prepared to say that, because the English law gives the stockholders not assenting the liberty to appeal to the courts of that country, therefore the courts of this country should deny to a citizen of this country the opportunity to litigate his rights, in respect to property, situated here, in our own courts. My own view is that the court has jurisdiction, and that the complainants are entitled to the relief prayed in their bill.